UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JEREMY DIXON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:10-cv-00072-SEB-WGH |
| ) | |
| JOHN BRYSON, Secretary of Commerce, ) | |
| ) | |
| Defendant. ) | |

**Entry Granting Motion for Summary Judgment**

Jeremy Dixon was employed for less than a year as an intermittent statistical clerk for the Jeffersonville Telephone Center ("JTC") which collects statistical data for the Census Bureau. Following his termination, Dixon sued the Secretary of Commerce ("the Secretary")[1] for employment discrimination. In dispute is the cause of Dixon's termination. Dixon claims that his termination was a result of sex and disability discrimination. The Secretary argues that Dixon was terminated because of his excessive absences (63 days) and tardiness during his one-year probationary period and not because he is a man or disabled.

The Secretary seeks resolution of this action through summary judgment. For the reasons explained below the motion for summary judgment [70] is **granted** and the Secretary is entitled to judgment as a matter of law.

**Standard of Review**

AAs stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.@ *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). The motion for summary judgment in this civil rights action, as with any such motion, must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears "the initial

---

[1] John Bryson, Secretary of Commerce, replaced Acting Secretary Rebecca M. Blank effective October 21, 2011. See dkt. 93.

responsibility of informing the district court of the basis for its motion," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322. However, the moving party is not required to negate those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.* at 323. Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. See *Harney,* 526 F.3d at 1104 (citing cases). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372 (2007). "The mere existence of a factual dispute is insufficient to overcome a motion for summary judgment; instead the nonmovant must present definite, competent evidence in rebuttal." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012).

### Statement of Facts

The undisputed facts are the following:

1. The Department of Commerce (the "Department") is made up of a number of bureaus, one of which is the Bureau of the Census ("Census Bureau"). The Census Bureau collects statistical data through surveys and censuses conducted through field operations. The National Processing Center ("NPC") and 12 Regional Offices located throughout the United States manage these field operations.

2. The NPC operates three telephone centers one of which is the Jeffersonville Telephone Center ("JTC") located in Jeffersonville, Indiana.

3. At the time in question, the JTC employed approximately 500 employees, both men and women, as statistical clerks or as they are sometimes called, telephone interviewers. These clerks collected statistical information through telephone interviews for the Department and other federal agencies.

4. Intermittent employees are not full-time employees and do not have a prearranged regular tour of duty.

5.      Statistical clerks' appointments are subject to the satisfactory completion of a one-year probationary period. The purpose of the probationary period is to evaluate the fitness of an employee, including the employee's conduct, dependability, general character traits and competence to determine whether to retain the employee for continued employment. Probationary employees do not have the same rights as non-probationary employees under collective bargaining contracts. During the probationary period, employees may be terminated at any time for any reason, and no counseling is required prior to terminating an employee during the probationary period. Unauthorized Absence/AWOL is grounds for immediate termination during probation.

6.      JTC management depended on telephone interviewers to work on surveys on which they were specifically trained. Dixon generally worked on surveys involving insurance and schools. Absences of interviewers negatively impacted the JTC's ability to complete projects in a timely manner because the reduced man hours hindered it from meeting the response and/or production rates required for a particular survey, making the data unusable. Absences also had a negative impact on other telephone centers which often had to increase their staffing on a moment's notice based on insufficient staffing at another center.

7.      To manage survey needs and estimated workloads, the managers and supervisors would advise scheduling clerks how many hours of work were needed for the month. Scheduling clerks were responsible for scheduling employees for survey work. Telephone interviewers were scheduled for work in two-week intervals. The scheduling clerks would meet with telephone interviewers to determine the days and hours that the interviewers were available for work during the two-week period. Telephone interviewers were able to choose the days and hours that they wished to work within the hours that were being offered as long as they signed up for 15 hours.

8.      During the first week of the previous pay period, the scheduling clerks would place a draft schedule at the check-in desk for telephone interviewers to review and make any necessary changes. During the second week, the scheduling clerks modified the draft schedule based on changes, if any, and created a final schedule. The final schedule was placed at the check-in desk where all telephone interviewers could review it. Once finalized, employees were expected to work their scheduled hours unless there was an emergency.

9.      If an employee called in and reported being unable to work on the scheduled workday, the scheduling clerks would need to arrange for another employee to work the original employee's scheduled shift. The reason the JTC did not permit changes to the final schedule except in emergency situations was because the JTC needed to structure the workload to ensure that it was accomplished.

10.     In 2005-2006, Ms. Brandt was the Branch Chief of the JTC. On a regular basis, Ms. Brandt would monitor JTC staffing and review staffing strategies to maintain its share of the workloads. She also reviewed the attendance and conduct of probationary employees prior to the end of the probationary period to make a recommendation concerning their employment.

11.     During this time, supervisory statistical assistants, in addition to their duties as research supervisors, acted as a supervisor for time and attendance purposes and routine activities for a specific group of statistical clerks. They were responsible for the periodic review of attendance records for the employees assigned to them. The timekeepers would provide the supervisors with information concerning the employees' attendance assigned to them for review. The supervisory statistical assistants would meet with Ms. Brandt periodically regarding projects, staffing problems, and employees. These supervisors were responsible for advising Ms. Brandt if employees had attendance issues. They had no authority to recommend or issue discipline to a statistical clerk. Dixon did not know Ms. Brandt personally, having seen her only on three occasions. He never had any difficulty with her.

12.     On September 26, 2005, Dixon was hired as an intermittent GS-4 statistical clerk for the Census Bureau, assigned to the JTC. The main function of Dixon's position was to perform telephone interviews in relation to the Census Bureau's surveys and censuses.

13.     Dixon's position was subject to a one-year probationary period. Dixon understood that, as a probationary employee, he could be fired if he did not show up for work. He understood that a "no-show" or AWOL was a serious offense. At the time Dixon accepted the position, he believed that he would be able to work the number of hours required for the position.

14.     Dixon received JTC orientation training, during which management explained the importance of attendance, rules and regulations, following correct call-in and administrative procedures, and reporting to work on time. Dixon received an Orientation Packet which also explained that failure to adhere to these requirements could result in termination. Dixon was aware that absenteeism, excessive schedule changes, continued unavailability for work or overall not honoring his work commitment could result in removal from the work schedule and subsequent termination. Dixon testified, however, that the trainees were specifically told that the written policies were not necessarily administered as written and that they should adhere to the explanations of policy rather than the written policies when the two were in conflict. One such unwritten policy was that statistical clerks could eliminate tardiness on their record by working additional time. Ms. Brant told the trainees that JTC management would be fair, reasonable, and eager to work with employees when unexpected things happen. Dixon was told that management

doesn't "just fire people" for attendance-related reasons and if there was a problem management would "come to" employees and "work with" them "in any way" possible. Dkt. 117-4 at p. 4.

15. Dixon was also instructed that if he was not going to come to work on a scheduled day, he was required to call the check-in desk within the first hour of his scheduled shift.[2] If the person answering the phone could not make a decision as to whether the absence was acceptable, the employee would be transferred to a supervisor to make that decision. Dixon testified that when he called in and the call was transferred he was usually transferred to Ms. Phyllis Smith. An employee who failed to timely call in would be charged with Unapproved Absence/AWOL. A schedule change form was also completed.

16. As for all statistical clerks, when reporting for work, Dixon would sign into both the timekeeper's and the check-in desks at the beginning of his shift and would sign out when he left for the day. The timekeeper, Vi Richardson, would verify the time he arrived to work and record the time. Dixon had no problems with Ms. Richardson. Records of attendance were kept at both the timekeeper's and check-in desks.

17. After checking in, Dixon would report to his workstation, which was subject to change depending upon which survey he was working. Dixon worked alongside both men and women.

18. Dixon had numerous research or survey supervisors at different times depending on which survey he was working.

19. Phyllis Smith was Dixon's research supervisor for two surveys. The first survey (referred to as "SASS") was conducted between November 28, 2005, and December 20, 2005. The second survey (referred to as "SSOCS") began on March 14, 2006 and lasted approximately four or five weeks. Ms. Smith was also Dixon's supervisor for time and attendance purposes during his employment at JTC. Ms. Smith did not work at either the timekeeper's or the check-in desks. Nor did she maintain the records for attendance, and she had no role in scheduling employees for work or monitoring employees' attendance at the timekeeper's or check-in desks.

20. Dixon was absent from work while working for each of his research or survey supervisors. During his first six weeks of work, Dixon called in absent on October 26,

---

[2] The plaintiff testified to one exception, that is if there was a situation where an absence was expected to last three or more days, the employee could call in just once by advising the supervisor of the situation and expected duration of absence. Dkt 117-4 at p. 17.

October 27, November 8, November 9, and November 15, 2005. He did not provide any documentation concerning these absences.

21.    In November 2005, Ms. Smith became aware that Dixon's attendance was unacceptable, and that he had already missed five days of work without providing documentation. Dixon testified that Ms. Smith never told him that his attendance was unacceptable. Ms. Smith probably informed Ms. Brandt of Dixon's absenteeism in November 2005, as part of her job. Any information she provided Ms. Brandt would have been based upon Dixon's attendance records, which she was not responsible for keeping.  Ms. Brandt told Ms. Smith to counsel Dixon.

22.    On November 17, 2005, Ms. Smith counseled Dixon in writing concerning his excessive call-ins. Dixon was told that continued call-ins could result in administrative action being taken against him, and he understood that such action could include termination. Dixon testified that he was counseled about providing acceptable documentation for his absences. Dixon states that he was not counseled on absenteeism nor was he notified that there was dissatisfaction with the fact of the absences.

23.    On February 4, 2006, Dixon was diagnosed with pinched nerves in his back and his doctor issued an order for Dixon to deliver to his employer stating:

> This patient needs a chair modification with armrests. Have Health Unit try to accommodate patient with proper chair.

(Exh. 4 at 3). Dixon delivered the order to the JTC and Dixon received a new chair reserved for him within an hour of making the request.

24.     Dixon continued to be absent from work for a variety of reasons. Even though he had just been counseled in mid-November,[3] Dixon called in absent December 8, December 9, December 12, 2005, January 5, January 11, January 12, January 18, January 19, January 26; February 3, February 14, February 24, February 27, February 28; March 1, March 2, March 3, March 8, March 9, March 22, March 23, March 24, March 27, March 28, March 29, March 30, March 31; April 25, April 26, April 27, April 28; May 1, May 2, May 3, May 4, May 5, May 8, May 9, May 10, May 11, May 12; June 13, June 14, June15, June 16, June 23; July 12, July 19, July 20, July 26, July 27; August 8, August 9, August 11, August 12, August 15, August 16, and August 22, 2006. Dixon testified that he was absent on many of the days cited although he believes there may be some unidentified errors.

---

[3] Dixon again notes that the counseling in mid-November was on the documentation policy and not on the fact that absences had occurred.

25.     Dixon was also recorded as tardy on October 18, November 1, November 4, November 18, December 22, 2005; January 13, January 17, January 24, February 6, February 9, February 10, February 17, February 21, March 13, April 11, April 13, April 14, April 20, June 10, June 20, June 22, July 1, July 22, July 30, August 1, August 3, and August 19, 2006. Dixon testified that some of his tardiness was due to delays at the security checkpoint which were beyond his control. In addition, he was not permitted to take advantage of an unwritten policy which allowed employees to negate tardiness by working additional time at the end of their shifts.

26.     Dixon was concerned about his absenteeism and he talked to Sally Bell, a scheduling clerk, a few times about his concern. Ms. Bell was not responsible for documenting attendance or making decisions regarding discipline. Dixon never spoke to a supervisor about his absenteeism. Dixon believes that even if he had tried, he would not have been able to work on his scheduled work days. (Plf's Dep. 173:25; 174:1-9.)[4]

27.     Dixon was scheduled to work on August 4, 2006, but he did not report for work. He also did not call the JTC within one hour of when he was scheduled to begin work. As such, Dixon's absence was marked Unapproved Absence/AWOL. Dixon testified that this designation was inappropriate because he had called the JTC on August 3, 2006, and stated that he expected the same set of circumstances to persist for three or more days and in such case further call-ins were not required.[5]

28.     Sometime after August 4, 2006, Ms. Smith was advised that Dixon was a "no show" for work on August 4, 2006. When she reviewed his attendance record, she also noted that his attendance was overall unacceptable and that he had an excessive number of schedule changes. Ms. Smith prepared a Supervisor's Counseling Form concerning these issues so that she could counsel Dixon in person concerning his attendance. However, Ms. Smith was unable to counsel Dixon because of his continued absences.

---

[4] Dixon states that days before August 4, 2006, he attempted to meet with Smith about lost doctors' notes and errors in his attendance record. Smith responded by laughing at Dixon and telling him to "get out of here." This statement is not supported by a citation to admissible evidence. See Dkt. 117-2 at p. 17.

[5] Dixon argues that Smith should have asked Dixon about the No-Call/No-Show designation on his record in August 2006. Dixon states that he did not learn of the designation on his record until he received the September 6, 2006, termination letter. Dixon states that he missed work in early August 2006 due to credible threats made against him by his unstable and abusive stepfather who had been released from Jail at the end of July 2006. Dixon states that his stepfather threatened to lie in wait and ambush Dixon as he walked to or from work and to become an employee at the NPC in order to carry out an attack on Dixon "within the confines of a secure federal installation." Dkt. 117-2 at p. 16.

29.     Dixon's probationary period was scheduled to end on September 26, 2006. Prior to that date, the Human Resources Division sent Ms. Brandt a CD-35 Record of Probationary Period Report.

30.     As was Ms. Brandt's responsibility and practice before making a recommendation concerning a probationary employee, she reviewed copies of Dixon's schedules from the time of his initial employment in September 2005 through August 2006. These records showed that from October 26, 2005, through August 22, 2006, Dixon had called in absent on 63 scheduled workdays. Seventeen of those call-ins were unapproved absences. She saw that Dixon was tardy on 27 occasions. Ms. Brandt also discovered that Dixon had been AWOL on August 4, 2006.

31.     Ms. Brandt noted that Dixon had been issued counseling on November 17, 2005, concerning his absences. She also saw that an August 21, 2006, counseling notice had not been given to him because he had been off work beginning August 22, 2006.

32.     Based upon her experience and training and administrative responsibility, in August 2006, Ms. Brandt decided to recommend that Dixon's employment be terminated based upon his unacceptable attendance, unauthorized absence, tardiness and failure to follow proper JTC scheduling procedures.

33.     On August 25, 2006, Ms. Brandt recommended to Grant Goodwin, Chief, Human Resources Branch, that Dixon's employment be terminated. Mr. Goodwin worked with the Office of General Counsel to review the documentation and then approve or disapprove the recommendation based upon whether the recommendation was appropriate given the employee's conduct and NPC policies. If approved, the Human Resources Branch would process the Probationary Report and prepare the subsequent letters, including the letter of removal.

34.     Ms. Brandt's recommendation to terminate Dixon's employment was approved and Human Resources prepared a termination letter, dated September 6, 2006, for her signature and issuance to Dixon. Dixon received the termination letter. Dixon was absent from work on the dates listed in the termination letter and tardy on the listed dates as well. Dixon also acknowledges that JTC records reflect that 17 of the 63 absences were for unapproved absences.[6]

35.     Dixon's termination was not effective until September 12, 2006, and he was scheduled to work from September 6, 2006 through September 12, 2006. Dixon refused to report to work, and failed to alert the JTC that he was not going to work

---

[6] Dixon argues that medical documentation was disregarded for more than 17 dates, but this claim is not supported by a citation to admissible evidence. See Dkt. 117-2 at 19-20.

his scheduled dates. Upon receipt of his termination letter, Dixon severed all contact with JTC.

36.     On October 27, 2006, Dixon filed an administrative Complaint of Employment Discrimination. In his Complaint (the "EEO Complaint"), Dixon was asked to "describe the action(s) or policy(ies) you believe was (were) discriminatory," and he responded by attaching a typed complaint in which he indicated that he "believe[d] [his] termination was discriminatory in nature, highly arbitrary in substance, and was executed in direct contradiction of supervisory and organizational reassurances and praise in an effort to avoid retaining me in a layoff status." (Dkt 4-1 at 1-2.) Dixon indicated that he "believe[d] that, had [he] been a female employee, he would have received far better treatment and at the very least an ounce of common courtesy." (*Id.*) Dixon was also asked to state the "reason(s) for the alleged discrimination," and he checked "Sex Male." (*Id.* at 1.) He did not check "disability," although this basis was listed as a potential reason he could select. (*Id.*) He never mentioned any failure to accommodate or disparate impact claims. Dixon did, however, allege that the attendance policy was applied arbitrarily because the words "emergency" and "excessive" are not defined.

37.     Based upon his administrative Complaint of Employment Discrimination, on December 11, 2006, the Department of Commerce, Office of Civil Rights, notified Dixon that it had accepted the sex discrimination claim for investigation. Dixon was informed that he could notify the Office of Civil Rights if he believed the issue in his complaint was not correctly identified within 15 days after receipt of the notice.

38.     Dixon did not notify the Office of Civil Rights that he was also making disparate impact and Rehabilitation Act claims. Once the investigation of the accepted issue was completed, a Report of Investigation was provided Dixon.

39.     Dixon sent a "Rebuttal" to the Report of Investigation, but he did not contend that he was bringing Rehabilitation Act or disparate impact claims. Dixon did continue to complain about the arbitrary application of the attendance policy and the undefined terms "emergency" and "excessive."

40.     On October 19, 2007, the agency concluded that Dixon had failed to prove he was subjected to sex discrimination concerning his termination and issued a final agency decision.

41.     Dixon appealed the final agency decision, and on December 14, 2007, he filed his Appeal Brief, arguing that the agency erred in finding that he was not subject to sex discrimination when the agency issued him a letter of termination on September 6, 2006.

42. On October 8, 2009, the Office of Federal Operations ("OFO") issued its decision affirming the agency's final decision that the evidence of record did not establish that discrimination occurred. Dixon then requested that the OFO reconsider its decision. In his request, he admitted that he had chosen not to make a disability claim. (Docket 34-3 at 11). Again, he never mentioned any disparate impact claims. (*See id.* generally.) On April 22, 2010, the OFO denied Dixon's request for reconsideration.

## Discussion

Dixon alleges three claims in this employment discrimination action. First, he claims that he was discriminated against because he is male. Second, he claims that he was discriminated against because of his disability. Third, he alleges a disparate treatment claim based on either sex or disability. For the reasons explained below, each of Dixon's claims is without merit and the Secretary is entitled to judgment as a matter of law.

### *Sex Discrimination Claim*

Dixon claims that his employment was terminated because of his gender (male). While it is undisputed that Ms. Brandt recommended his termination, Dixon claims that it was Ms. Smith who discriminated against him by somehow influencing Ms. Brandt's decision.

Title VII makes it unlawful for an employer to discriminate against any individual in regards to the terms, conditions or privileges of employment because of that individual's sex, among other factors. 42 U.S.C. §2000e-2(a)(1). To satisfy the burden of proof under Title VII, a plaintiff may either: 1) present direct evidence of discriminatory intent; or 2) use the indirect, burden-shifting procedure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998).

Dixon points to no evidence that would support a direct evidence claim. Consequently, he must proceed under the indirect burden-shifting analysis. Under *McDonnell Douglas*, Dixon must establish a *prima facie* case of sex discrimination by showing: 1) he is a member of a protected class; 2) he performed his job satisfactorily; 3) he suffered an adverse employment action; and 4) the defendant treated similarly situated employees outside his class more favorably. *Weisbort v. Med. Coll. Of Wisconsin*, 79 F.3d 677 (7th Cir. 1996). To withstand summary judgment, Dixon must prove all elements of his *prima facie* case for each claim. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). If Dixon establishes a *prima facie* case, the burden of production shifts to the Secretary, who must offer a legitimate,

non-discriminatory reason for his actions. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995). If the Secretary presents such a reason, then Dixon must demonstrate a genuine issue of material fact as to whether the reason is pretextual. *Id.* As explained below, Dixon's claim fails as a matter of law at each of these steps.

For the purpose of this motion, the court assumes that the first three components of Dixon's *prima facie* case are satisfied. Specifically, Dixon is a man, who performed his duties satisfactorily and was terminated. Dixon's arguments focus on his view that his performance was satisfactory because he was never notified that his attendance was a problem and he was a good interviewer. But, even assuming that he performed his job duties successfully, he has not presented evidence upon which a jury could conclude that any female employee was treated more favorably. In his Response, Dixon mentions a female employee whose "name might have been Sue or Sue Ellen, who was asleep at her desk." (Dkt. 117-2 at 29.) However, there is no evidence upon which a fact finder could conclude that Sue or Sue Ellen is a similarly situated employee. There is no evidence of the identity of "Sue's" supervisor, her job position, or any other comparable information. Most importantly, "Sue's" conduct is not "functionally equivalent" to Dixon's extreme absenteeism. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008). Indeed, Ms. Brandt testified that in her experience as a supervisor, Dixon's attendance was among the worst she had ever seen in the 12 years she had been manager of the JTC. Because Dixon cannot present sufficient evidence that a similarly situated employee was treated more favorably than he was, Dixon has failed to establish the requisite *prima facie* case for discrimination and summary judgment is proper for the Secretary on this basis.

In addition, Dixon has shown no evidence that his termination was in any way connected to his gender or that the Secretary's reasons for firing him were pretextual. Indeed, the Secretary's decision was perfectly within an employer's province. Absenteeism and tardiness are legitimate non-discriminatory reasons for terminating an employee. *See, e.g., Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997); *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 296 (7th Cir. 1998). Indeed, "[i]t almost goes without saying that an employer has a legitimate interest in insuring that each employee's work continues at a steady pace . . . . Reliability and promptness are important considerations in maintaining a work force." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir. 1992). Although Dixon complains that he was not given sufficient warnings before he was terminated, it is undisputed that there was no requirement to do so. With the benefit of hindsight, Dixon argues that if he was warned that his attendance was considered a problem he could have reduced his schedule and utilized the Employee Assistance Program to resolve the matter. But again, Dixon was not entitled to a warning. As a probationary employee he could be terminated for any reason as long as it was not a prohibited reason. In addition, there is no evidence that Ms. Brandt did not believe that her decision to terminate Dixon's employment was correct. Ms. Brandt based her decision to

terminate Dixon solely on impersonal data. Because Dixon cannot show pretext, the Secretary is entitled to judgment in his favor. *See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998) (to show pretext, an employee must show that employer's reason for dismissal is a lie).

Dixon argues, however, that it was Ms. Smith who inappropriately influenced Ms. Brandt's recommendation to terminate Dixon's employment because he is a man. This theory is sometimes called the "cat's paw" theory. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 & n.1 (2011). In discussing whether an employer would be held liable where the decisionmaker was not accused of discrimination, but where a non-decisionmaker who possessed the requisite enmity toward the protected characteristic was alleged to have influenced the decision, the Supreme Court held that the correct test of employer liability was one of proximate cause. *Staub*, 131 S. Ct. at 1194. The Court explained that:

> if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. . . . The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action.

*Id.* at 1193. Here, any information Ms. Smith may have provided Ms. Brandt in November 2005, concerning Dixon's absenteeism was true and undisputed and was not based on his gender. Dixon was absent on the 63 days and tardy on the 27 days listed in his letter of removal. There is no evidence that Ms. Smith provided information to Ms. Brandt that was inaccurate nor did she withhold information. Other than his "belief" that Ms. Smith somehow participated in the decision to terminate his employment and that she acted improperly because "he was a man," Dixon has no admissible evidence to support his allegations. The undisputed evidence is that Ms. Brandt thoroughly reviewed Dixon's records before ultimately recommending his termination. Ms. Smith had no responsibility for these records and had no input into Ms. Brandt's decision. Ms. Brandt's recommendation was further reviewed by Human Resources and the Legal Department, and those departments concurred with her recommendation. Under these circumstances, the alleged animus of Ms. Smith was not a proximate cause of Dixon's termination. Ms. Brandt's independent investigation was based upon the undisputed "impersonal data" contained in Dixon's attendance records, and her decision to recommend Dixon's termination was justified. As such, summary judgment is proper for the Secretary on this basis as well.

***Rehabilitation Act and Disparate Impact Claim***

In his Amended Complaint, Dixon also seeks to bring a failure to accommodate claim under the Rehabilitation Act and a disparate impact claim under Title VII and the Rehabilitation Act.

### 1. Exhaustion

The initial problem with these claims is that Dixon failed to exhaust his administrative remedies. The Seventh Circuit has held that a plaintiff is barred from raising a claim in the district court that had not been raised in his or her administrative charge unless the claim is reasonably related to one of the charges and can be expected to develop from an investigation into the charges actually raised. *Green v. National Steel Corp., Midwest Div.*, **197 F.3d 894, 898 (7th Cir. 1999).** Simply put, for these claims a plaintiff must exhaust his administrative remedies before bringing an action in federal court. *See, e.g., Gibson v. West,* **201 F.3d 990, 993 (7th Cir. 2000);** *Oates v. Discovery Zone*, **116 F.3d 1161, 1168 (7th Cir. 1997).**

Because Dixon did not exhaust his administrative remedies with respect to any claim under the Rehabilitation Act or any claims of disparate impact under Title VII, he cannot now expand his claims beyond those he actively identified for the agency to investigate. Dixon's disparate impact claims are conceptually and factually distinct from allegations of disparate treatment and his pursuit of a disparate treatment claim did not exhaust his disparate impact claim. *Noreuil v. Peabody Coal Co.*, **96 F.3d 254, 258-59 (7th Cir. 1996);** *see also Diersen v. Walker*, **117 Fed. Appx. 463 (7th Cir. 2004).** In addition, Dixon's claim that he was "disabled" and that the Secretary somehow violated the Rehabilitation Act by providing him with the requested chair, but not following up with him to see if he had any other problems is simply not like or related to his termination claim based upon his sex. *See Green,* **197 F.3d at 897-98** (dismissing failure to accommodate claim for failure to exhaust because failure to accommodate claim and ADA discriminatory treatment claim were not like or reasonably related to one another).

These claims have not been fully exhausted and are subject to dismissal on that basis. Even if Dixon had exhausted his administrative remedies, Dixon cannot prevail on these claims.

### 2. Disability Discrimination

The Rehabilitation Act provides that "no qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination . . .

13

". 29 U.S.C. § 794(a). The Rehabilitation Act applies the same standards as those used to interpret the ADA. 29 U.S.C. § 794(d). Under the ADA, discrimination includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). Thus, in addition to showing that he is a qualified individual with a disability, Dixon must show that his supervisors at JTC were aware of his disability and still failed to reasonably accommodate him. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (7th Cir. 2001). Dixon's claim fails on both accounts.

First, Dixon cannot show that he is a qualified individual with a disability. Under the Rehabilitation Act, a person is disabled if he has a physical or mental impairment that substantially limits one of more of his major life activities. *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004) (citing 29 U.S.C. § 705(20)(B)). To be substantially limiting, an impairment must "prevent[ ] or severely restrict[ ] the individual" in a major life activity. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002). There is no evidence that Dixon had a physical or mental impairment that substantially limited one of more of his major life activities at the time of his termination. Moreover, Dixon's absences were due to several reasons, not just his alleged back problems. *Mays v. Principi*, 301 F.3d 866, 869 (7th Cir. 2002) (back problems limiting an employee to light work is not a disability). Because Dixon cannot establish that he was disabled at the time in question, his claim fails.

Second, regardless of whether he was disabled, Dixon cannot show that his employer failed to reasonably accommodate his request for a different chair. It is undisputed that Dixon was provided the chair within one hour of his making the request. Dixon's vague argument that after he received the chair he made additional unspecified "implied requests" which were denied by an unidentified person is not supported by admissible evidence and is insufficient to create a material fact in dispute. Even now, there is no indication what specific accommodations Dixon believed he needed. Because Dixon cannot show that his employer failed to reasonably accommodate his request, his claim fails for this reason as well.

### 3. Disparate Impact Claim

In his Amended Complaint, Dixon also seeks to bring a disparate impact claim under Title VII and the Rehabilitation Act. Dixon argues that utilizing subjective criteria to determine whether or not an employee's absence was considered an emergency or excessive had a disparate impact on him as a disabled employee or a man. Under a disparate impact theory, an employer is held liable when a facially neutral employment practice disproportionately impacts members of a legally protected group. *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005).

Specifically, Title VII prohibits "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001)). A plaintiff must be a member of the protected class before he can bring a disparate impact claim. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000). As explained above, Dixon is not disabled under the Rehabilitation Act. Consequently, he cannot bring a disparate impact claim under the Rehabilitation Act. *Id.* (affirming summary judgment on ADA disparate impact claim where plaintiff was not disabled under Act). In addition, there is no evidence that any policies concerning "excessive absenteeism" disparately impacts individuals who are men or have disabilities. Accordingly, the Secretary is entitled to summary judgment in his favor on Dixon's disparate impact claims.

## Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society=s expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Dixon has not identified a genuine issue of material fact as to his claims in this case, and the defendant is entitled to judgment as a matter of law. The motion for summary judgment [70] is therefore **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 03/18/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution:**

JEREMY DIXON
3921-3 Armstrong Court
Jeffersonville, IN 47130

All Electronically Registered Counsel